[Cite as *State v. Maultsby*, 2014-Ohio-5479.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 14CA010526 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| TERENCE D. MAULTSBY | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 13CR086806 |

DECISION AND JOURNAL ENTRY

Dated: December 15, 2014

BELFANCE, Presiding Judge.

{¶1} Terence Maultsby appeals from his convictions in the Lorain County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} A grand jury indicted Mr. Maultsby on two counts of kidnapping with attendant sexual motivation and sexually violent predator specifications and one count of rape. Prior to trial, the sexually violent predator specifications were dismissed. Following his trial, the jury found Mr. Maultsby guilty on all counts and remaining specifications. The trial court merged the kidnapping counts for purposes of sentencing and sentenced Mr. Maultsby to an aggregate term of eight years in prison.

{¶3} Mr. Maultsby has appealed, raising a single assignment of error for our review.

ASSIGNMENT OF ERROR

THE GUILTY VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF MR. MAULTSBY'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶4}   Mr. Maultsby argues that his convictions are against the manifest weight of the evidence.  In reviewing a challenge to the weight of the evidence, the appellate court

[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶5}   The jury found Mr. Maultsby guilty of violating R.C. 2905.01(A)(2) and 2905.01(A)(4), which provide that

[n]o person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter;

* * *

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]

"'Sexual activity' means sexual conduct or sexual contact, or both."  R.C. 2907.01(C).

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another.  Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A). "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). The jury also found Mr. Maultsby guilty of rape pursuant to R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶6} S.P. testified that, on February 18, 2013, she went to her friend's home in the morning for coffee and spent the entire day at her house, leaving only to go to the store to buy beer and cigarettes. The women went to the store a second time in the afternoon to get more beer. While they were walking to the store, the women encountered Mr. Maultsby in his front yard. According to S.P., although she had seen Mr. Maultsby before because he performed maintenance work for her landlord, she did not know his name or that he lived just down the street from her. S.P.'s friend stopped to talk to Mr. Maultsby, and S.P. continued walking to the store. S.P.'s friend caught up with S.P. and asked it if would be permissible for Mr. Maultsby come to join them at S.P.'s house. S.P. told her friend that Mr. Maultsby could come to her house, and Mr. Maultsby arrived at her house a short time after the women did.

{¶7} According to S.P., the three of them sat at her dining room table and drank. S.P.'s friend and Mr. Maultsby also smoked marijuana, which Mr. Maultsby had brought. Because S.P. did not know Mr. Maultsby, she had to repeatedly ask him what his name was. Mr. Maultsby stayed at S.P.'s house for about an hour. During that time, Mr. Maultsby tried to kiss S.P. while they were sitting at the table. Later, when S.P. went to check if someone was at the front door, Mr. Maultsby tried to dance with her and tried to kiss her again. Both times, S.P. told him no

and pushed him away. Eventually, Mr. Maultsby left but not before he had programmed his number into S.P.'s phone.

{¶8} After Mr. Maultsby left, S.P.'s friend discovered that she could not locate her phone or her wallet. S.P. and her friend searched the house but could not find the items. S.P.'s friend called Mr. Maultsby on S.P.'s phone, and he returned to help them look. Mr. Maultsby returned to the house and found the phone and the wallet under a chair. However, S.P. testified that she and her friend had previously searched that location and the wallet and phone had not been there.

{¶9} S.P. testified further that everyone left her house around 8:30, including Mr. Maultsby. S.P. shut her front door but did not lock it because her daughter who lived with her did not have a key. She went upstairs to take a shower before going out to meet a friend. S.P. removed her pants in the bedroom before using the restroom. While she was seated on the toilet, she heard her bird making noise downstairs and saw Mr. Maultsby climbing the stairs. When Mr. Maultsby looked at her through the open bathroom door, S.P. asked him what he was doing, and Mr. Maultsby responded that he was there to spend time with her.

{¶10} S.P. told Mr. Maultsby to leave, but Mr. Maultsby entered the bathroom and grabbed S.P. just beneath her chin. S.P. stood up and Mr. Maultsby grabbed her by her t-shirt and took her to the bedroom. He forced S.P. to lie on the bed and pinned her by lying on top of her. Then Mr. Maultsby engaged in sexual intercourse with S.P., eventually ejaculating onto her stomach and sheets.

{¶11} According to S.P., she told Mr. Maultsby that she needed to have a cigarette, and he let her leave the bedroom. S.P. took her jeans from the bedroom and put them on when she went downstairs. Mr. Maultsby called down to her, asking why she was taking so long, and S.P.

replied that she was calling the police. S.P. testified that she ran to the abandoned house next door and stood in the pouring rain waiting for the police to come. Mr. Maultsby ran back to his house.

**{¶12}** Officer Wesley Fordyce testified that he arrived at S.P.'s house and found her sitting inside near the front door. According to Officer Fordyce, S.P. "was very upset. She was crying, shaking, almost hysterical." S.P. did not have any shoes on, and her socks were wet and muddy. Officer Fordyce had S.P. sit in his cruiser while he interviewed her. He testified that, when he was escorting S.P. to his cruiser, she refused to let him touch or assist her.

**{¶13}** According to Officer Fordyce, S.P. told him about what had happened, identified Mr. Maultsby by name, and pointed out Mr. Maultsby's house. Officer Fordyce went to Mr. Maultsby's house, and Mr. Maultsby answered the door. Mr. Maultsby was sweating profusely but claimed to have been sleeping. S.P. subsequently identified Mr. Maultsby as the man who had raped her, and Officer Fordyce placed him under arrest.

**{¶14}** After S.P. was transported to have a rape kit performed, Officer Fordyce entered her house and, with the assistance of other officers, took pictures of her bed sheets and collected them for evidence. Officer Fordyce testified that the bed sheets had a wet stain on them. Officer Fordyce also took pictures of the sidewalk in front of S.P.'s house because there were "footprints leading from * * * the front of her house and down the sidewalk around the corner right up to his steps and into [Mr. Maultsby's] house."

**{¶15}** Officer Fordyce testified that he spoke with Mr. Maultsby at the police station later that evening. During that interview, Mr. Maultsby initially denied ever being at S.P.'s house that evening but eventually told Officer Fordyce that he had brought marijuana to S.P.'s house and that he had been "partying, drinking and smoking." Mr. Maultsby also told Officer

Fordyce that he had left but came back when S.P.'s friend had called him saying she had lost her wallet. However, Mr. Maultsby was adamant that "he hadn't had sex of any kind with anyone, and he specified that he hadn't had sex with [S.P.'s friend], he hadn't had sex with [S.P.], and he hadn't had sex with * * * his wife and clarified it was his girlfriend."

{¶16} Sergeant Dennis Camarillo testified that he interviewed Mr. Maultsby the morning of February 19, 2013, and a video recording of the interview was played for the jury. In the video, Mr. Maultsby denied that any sexual activity occurred the prior evening, claiming that he had only danced with the women and kissed them on their cheek or forehead. At the end of the interview, Sergeant Camarillo asked Mr. Maultsby again if any sexual activity had taken place, and Mr. Maultsby again denied that it had.

{¶17} Sarah Griffith testified that she was a Sexual Assault Nurse Examiner and had examined S.P. the night of the incident. Ms. Griffith did not observe any physical injuries on S.P. but testified that injuries are not always noticeable until a number of hours after an incident. Ms. Griffith discovered traces of semen below S.P.'s navel and collected samples. She also took samples from S.P.'s vaginal and anal areas.

{¶18} Mr. Maultsby stipulated to the admission of reports from the Bureau of Criminal Investigation, which indicated that DNA testing had been performed on the vaginal and anal samples collected by Ms. Griffith. According to the reports, it was a near certainty that Mr. Maultsby was the source of the semen found on those samples.

{¶19} Mr. Maultsby's appellate argument appears to be that his convictions for kidnapping and rape are against the manifest weight of the evidence because S.P.'s testimony lacked credibility. Notably, Mr. Maultsby does not address any of S.P.'s testimony about the alleged offenses. Instead, he points to potential contradictions in her testimony about issues

tangential to the offense, essentially arguing that these inconsistencies call her entire testimony into doubt.

{¶20} Specifically, Mr. Maultsby points to differences between S.P.'s testimony that she stood in the rain waiting for the police and Officer Fordyce's testimony that he found S.P. inside her house when he arrived and that it had not been raining. Mr. Maultsby also points to S.P.'s testimony that she knew him only in passing despite living nearby and knowing his full name. Finally, he argues that her testimony is not credible because, if she was standing at the front door or at the house next door, she would have seen him leave "[b]ut[ S.P.] did not testify that she saw Mr. Maultsby leave[] or where he went."

{¶21} We initially note that S.P. did testify that Mr. Maultsby ran back to his house without his shirt on. Thus, while S.P. may not have directly testified that she saw Mr. Maultsby leave her house, that fact was implicit in her testimony, making Mr. Maultsby's argument to the contrary tenuous at best. Similarly, although Officer Fordyce's testimony contradicted S.P. regarding whether it was raining on the night in question, Officer Fordyce also testified that S.P.'s socks were wet and muddy, from which a reasonable juror could conclude that S.P. had run outside only in her socks. Furthermore, given the testimony of Officer Fordyce that S.P. was "almost hysterical[,]" the jury could have reasonably believed that S.P.'s memory of the events immediately following the assault could have been affected by her emotional state. *See State v. Williams*, 9th Dist. Lorain No. 12CA010298, 2014-Ohio-971, ¶ 17 (The trier of fact is "entitled to believe all, part, or none of the testimony of each witness.") (Internal quotations and citations omitted.).

{¶22} In any case, the jury was aware of these potential issues with S.P.'s testimony and could weigh them in assessing her credibility. *See id.* ("This Court has recognized that the trier

of fact is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.") (Internal quotations and citations omitted.). Furthermore, none of the evidence at trial contradicted S.P.'s account of the attack, specifically, that Mr. Maultsby grabbed her while she was in her bathroom and dragged her to her bedroom to have sexual intercourse with her. Semen found on vaginal and anal swabs taken from S.P. almost certainly came from Mr. Maultsby, and Nurse Griffith's examination of S.P. revealed semen on her navel, which was consistent with S.P.'s testimony. Additionally, Officer Fordyce testified that Mr. Maultsby initially denied having been at S.P.'s house before admitting that he had been there; in other words, Officer Fordyce testified that Mr. Maultsby had lied to him. Similarly, the DNA evidence in this case suggests that Mr. Maultsby almost certainly engaged in sexual intercourse with S.P. notwithstanding his repeated denials. Given the physical evidence undermining Mr. Maultsby's statements, the jury could well have concluded that portions of the statements Mr. Maultsby gave to the police corroborated S.P.'s testimony and that Mr. Maultsby's absolute denial that any sexual activity took place with S.P. was not credible.

{¶23} Accordingly, after a thorough review of the record and in light of Mr. Maultsby's appellate arguments, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice when it found Mr. Maultsby guilty of kidnapping and rape. His assignment of error is overruled.

### III.

{¶24} In light of the foregoing, the judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
CARR, J.
CONCUR

APPEARANCES:

NICHOLAS HANEK, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.